Case 2:15-cv-00711-JRG-RSP   Document 1   Filed 05/12/15   Page 1 of 60 PageID #:  1

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **BSN SPORTS LLC f/k/a BSN SPORTS, INC.,** | § | |
| | § | |
| | § | |
| **Kwik Trip, Inc.,** | § | |
| | § | |
| **ADFP Management Inc.,** | § | |
| | § | |
| **Citi Trends, Inc.,** | § | |
| | § | |
| **Allsup's Convenience Stores, Inc.,** | § | |
| | § | |
| **RaceTrac Petroleum, Inc.,** | § | |
| | § | |
| **Quick Chek Corporation f/k/a Quick Chek Food Stores,** | § | **Civil Action No.** |
| | § | _____ |
| **QuikTrip Corporation, QuikTrip West, Incorporated,** | § | |
| | § | |
| **Wawa, Inc., and** | § | |
| | § | |
| **Waffle House, Inc. as Assignee on Behalf of Waffle House Franchises** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **Visa Inc., Visa U.S.A. Inc., Visa International Service Association, MasterCard Incorporated, and MasterCard International Incorporated** | § | |
| | § | |
| **Defendants.** | § | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

In this Complaint against Defendants Visa Inc., Visa U.S.A. Inc., Visa International Service Association, MasterCard Incorporated, and MasterCard International Incorporated, Plaintiffs aver and allege as follows:

## INTRODUCTION

1.     This action is brought against Visa Inc., Visa U.S.A. Inc., and Visa International Service Association (collectively "Visa"); MasterCard Incorporated and MasterCard International Incorporated (collectively "MasterCard").

2.     Visa and MasterCard have in the past and continue to manage, coordinate, and govern a combination and conspiracy in restraint of trade within the meaning of the Sherman Antitrust Act, 15 U.S.C. § 1.  Each combination and conspiracy has as its members the overwhelming majority of banks or financial institutions that issue credit and debit cards in the United States.  The vast majority of the banks and financial institutions that are members of Visa are also members of MasterCard, and issue both Visa-branded and MasterCard-branded credit and debit cards.  These member banks are independently owned and managed banks and financial institutions that compete to issue credit and debit cards to consumers.  However, through their membership and agreement to abide by the rules of Visa

and MasterCard, each member bank has agreed not to compete for merchant acceptance of the credit and debit cards that it issues.

3.      There are two main categories of payment cards: credit (including charge) cards and debit cards.   Credit cards are payment cards that allow consumers to make purchases on credit.   Charge cards are similar to credit cards, but require that the full balance be paid upon receipt of the billing statement.   Debit cards are linked to a consumer's demand account or are prepaid.

4.      Banks earn income on credit (and charge) cards through fees and charges to the cardholder, including interest on the account balance, and from the fees and penalties that come with late payment on card balances.   Banks earn income on debit cards through the opportunity to use the funds a consumer maintains in his or her account and on various fees associated with those accounts. Banks also earn income on credit and debit cards through the interchange fees paid by merchants.   Interchange fees are imposed on merchants by Visa and MasterCard for the privilege of accepting the issuing bank's card from a consumer as a means of payment.   These fees are collected from the merchant and paid to the issuer of the card.   The profitability to issuing banks of credit and debit cards directly increases with the size and frequency of transactions in which the cards are used.

5.      Banks issuing credit and debit cards compete with one another to issue credit and debit cards to consumers (also referred to as "cardholders") who

use those cards to purchase goods and services from merchants.  Banks that are members of Visa and MasterCard compete with each other in the issuance of credit and debit cards to consumers.  For example, issuing banks offer cards with various combinations of interest rates, annual fees, cash back rewards, points, and other features to compete for cardholders and to induce cardholders to use their cards.

6.      Visa and MasterCard have adopted nearly identical rules, which their member banks agree to and impose on merchants that accept cards issued by those banks.  These rules, or Competitive Restraints, eliminate competition among their member banks for merchant acceptance of credit cards and debit cards.  Because Visa and MasterCard have as their members nearly all card issuers in the United States, and because those card issuers have agreed to rules that preclude them from independently competing for merchant acceptance, Visa and MasterCard and their members have obtained and maintained market power in the market for merchant acceptance of credit cards and the market for merchant acceptance of debit cards in the United States.  The exercise of this market power has led merchants to pay excessive interchange fees.  In this manner, Visa and MasterCard have unlawfully restrained competition in these markets.

7.      The principal rules that constitute the Competitive Restraints are the setting of "default" interchange fees, the Honor All Cards Rules, the All Outlets Rules, the No Discount Rules, and the No Surcharge Rules.  These rules have

precluded merchants from gaining the benefits of competition as to the terms for the acceptance of cards of particular issuing banks and have precluded card issuers from competing for merchant acceptance of their cards. As a consequence, the setting of "default" interchange fees effectively fixes the price of acceptance at a supra-competitive level. Plaintiffs have paid significantly higher costs to accept Visa-branded and MasterCard-branded credit and debit cards than they would if the Member Banks issuing such cards competed for merchant acceptance.

8. Because of their participation in the Competitive Restraints through their membership in Visa and MasterCard, issuing banks do not compete for transaction volume by independently competing for merchant acceptance.

9. Visa and MasterCard, on behalf of their member banks, have exploited their market power in the market for merchant acceptance of credit cards and the market for merchant acceptance of debit cards by creating interchange fee schedules designed to increase the amount of interchange issuing banks are able to obtain from merchants. While Visa and MasterCard nominally refer to these schedules as "default" interchange fee schedules, suggesting it is possible for issuing banks and merchants to gain different interchange rates by entering acceptance agreements between themselves, the Competitive Restraints prevent such agreements. The Competitive Restraints also eliminate the features of Visa and MasterCard to compete for merchant acceptance through setting low "default"

interchange fees.  By setting and enforcing supra-competitive interchange fees applicable to all merchants that accept cards issued by their members, Visa and MasterCard exercise the market power gained by their combinations and conspiracies.

10.    Over the past decade, judicial efforts to curb the exercise of market power by the Visa and MasterCard combinations have been ineffective.  In 2003, the exclusivity rules of both combinations, which prohibited member banks from issuing cards competing on American Express or Discover networks, were declared unlawful.  In that same year, in a class action settlement, Visa and MasterCard agreed to cease using the Honor All Cards Rules to tie credit card acceptance and debit card acceptance.  Those actions did not diminish Visa's and MasterCard's power to dictate price and prevent competition.  Immediately after those actions, both combinations increased the credit card interchange fees extracted from merchants.  The debit card interchange fees they were imposing after these judicial actions were subsequently found by the Federal Reserve Board to be significantly above cost.

11.    In 2008, in response to a U.S. Department of Justice investigation, Visa withdrew its rule limiting merchants' ability to accept PIN debit cards.  Two years later, in a settlement with the Department of Justice, the Visa and MasterCard combinations both amended their rules to allow merchants to offer

discounts to consumers in broader circumstances than previously allowed.  These changes did not diminish the combinations' market power or lead to a reduction in interchange fees paid by merchants.  Instead, interchange fees continue to increase.

12.     In 2011, as mandated by the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. 1693o-2, the Federal Reserve Board set a maximum level of interchange fees that large banks could levy on debit card transactions and eliminated any distinction between signature debit (which carried interchange rates comparable to credit interchange rates) and PIN debit interchange.  This maximum fee was set significantly below the then-existing interchange fee levels set by Visa and MasterCard for debit card transactions.  The Federal Reserve Board action did not apply to the approximately one-third of debit cards issued by smaller, non-regulated banks, nor did it apply to credit cards.  The Federal Reserve Board did not prohibit debit or credit interchange fees from being set below this maximum level.  Of note, on July 31, 2013 Judge Richard Leon held in *NACS, et al. v. Board of Governors;* Civil Case No. 11-02075 (D. D.C. July 31, 2013) that the Federal Reserve Board's regulation did not comply with the intent of the Durbin Amendment.

13.     If freed of the imposition of "default" interchange fees and the Competitive Restraints, issuing banks and merchants would operate in competitive markets for merchant acceptance of credit cards and merchant acceptance of debit

cards and benefit from competition among issuing banks as to interchange fees. Collectively set interchange fees do not protect merchants such as Plaintiffs, but rather allow issuing banks to charge interchange fees far in excess of the issuing banks' costs. In competitive markets, interchange fees would move to competitive levels, and the interchange fees paid by Plaintiffs would be substantially below the amounts they have paid since January 1, 2004. If merchants had the ability to use competitive strategies with respect to their acceptance of the cards of individual issuers, they would induce competition among issuing banks that would lead to lower interchange fees.

14. Plaintiffs collectively paid hundreds of millions of dollars in their last fiscal year alone in credit and debit interchange fees to issuing banks that are members of Visa and MasterCard. Interchange fees are generally one of a merchant's largest operating expense items. Elimination or modification of the Competitive Restraints and restoration of competitive markets for merchant acceptance would substantially reduce interchange fees, allowing Plaintiffs to operate more efficiently and at lower costs, to the benefit of consumers. Plaintiffs operate in intensely competitive markets and would use the savings from a reduction in their interchange costs to increase their competitiveness by enhancing the value their customers receive.

## JURISDICTION AND VENUE

15.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), because this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C. § 15(a)).

16.     Venue is proper in the United States District Court for the Eastern District of Texas under 28 U.S.C. §§ 1391 and 15 U.S.C. §§ 15 and 22. Defendants reside in, are found in, have agents in, and/or transact business in this District as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).  Thousands of merchants located in the Eastern District of Texas accept Visa and/or MasterCard Credit Cards and Debit Cards issued by one or more member banks.  A substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on within the Eastern District of Texas.  Accordingly, the acts complained of have had and will have substantial anticompetitive effects in this judicial district.

## DEFINITIONS

17.     For purposes of this Complaint, the following definitions apply.

18.     "Credit cards" are payment cards enabling the cardholder to purchase goods or services from any merchant that has an agreement to accept such cards. The credit cards at issue here are general purpose payment cards, as distinguished

from private label cards, which can only be used at a single merchant.  Payment to a merchant for the goods or services purchased using a credit card is made by the issuing bank of the card on behalf of the cardholder, with repayment by the cardholder subject to an agreement between the issuing bank and the cardholder. Credit cards enable a cardholder to obtain goods or services from a merchant on credit provided by the card issuer.  Credit card issuers compete for consumers by offering a variety of terms and types of cards, which vary by level of rewards that are intended to induce consumers to use their cards.  Cards with a higher level of rewards are often referred to as "premium" cards and carry higher interchange fees, though they afford no additional benefits to merchants.  Credit cards include charge cards, which allow the cardholder to obtain goods or services with a grace period before the cardholder is required to pay his or her full balance.

19.    "Debit cards" are payment cards that allow holders of accounts at a bank to pay for goods or services or to obtain cash by directly accessing their accounts.  They also include pre-paid cards, which require a prepayment of the amount that can be drawn by the user of the card.  There are two methods of authenticating debit cards.  PIN debit cards require the cardholder to enter a four-digit personal identification number (PIN) to authenticate the cardholder. Signature debit cards usually require the cardholder's signature at the time of the transaction.  In the past, some PIN debit cards did not carry interchange fees or

were subject to reverse interchange -where the merchant received a fee for card acceptance.  Signature debit cards generally carried higher interchange fees, some of which equaled the interchange fees charged for credit card transactions.  In 2011, pursuant to the Durbin Amendment, Federal Reserve Board regulations set the maximum interchange fee for regulated issuers at $.21 plus 0.05% (plus an additional $.01 for fraud prevention for eligible issuers), or an average of $.23-.24 per debit transaction.  In contrast, the signature debit interchange fees previously set by Visa and MasterCard average $.58 and $.59, respectively, for the same issuers.  Again, on July 31, 2013 Judge Richard Leon invalidated these regulations as inconsistent with the intent of the Durbin Amendment.

20.    An "issuing bank" is a member of Visa or MasterCard that issues general purpose credit or debit cards to cardholders.  The majority of issuing banks are members of both Visa and MasterCard and compete with one another to issue cards to potential cardholders and to encourage the use of their cards by cardholders.

21.    An "acquiring bank" is a member of Visa or MasterCard that acquires purchase transactions from merchants.  All acquiring banks are members of Visa and MasterCard.  As member banks, acquiring banks act as gatekeepers, ensuring that card transactions are routed over the Visa or MasterCard networks, that interchange fees set by Visa and MasterCard are paid on all transactions, and that

merchants abide by the rules imposed by Visa and MasterCard.  Acquiring banks compete with one another for the acquisition business of merchants.

22.   "Network services" include, among other things, the services of authorization, clearance, and settlement of payment card transactions that the members of Visa and MasterCard have delegated to the networks to provide on the members' behalf.  Authorization, clearance, and settlement refers to the process by which payment card transactions are completed.

23.   "Interchange fee" is the fee that issuing banks receive and merchants pay when they accept a credit card or debit card issued by a member of the Visa or MasterCard combinations.  Under the agreements by and among Visa and its member banks and MasterCard and its member banks, the so-called "default" interchange fees are set by Visa and MasterCard, respectively, and the payment on interchange and other rules are enforced through the acquiring banks.

24.   "Merchant discount" is the term used to describe the total amount of fees and other costs deducted from the original transaction amount, reflecting a merchant's incremental cost of acceptance.  The merchant discount includes the interchange fee.

## THE PARTIES

## PLAINTIFFS

25.     Plaintiff **BSN SPORTS LLC f/k/a BSN SPORTS, INC.** is a Delaware limited liability company with its principal place of business in Farmers Branch, Texas.  Plaintiff **BSN SPORTS LLC f/k/a BSN SPORTS, INC.** is also the successor in interest to **Kesslers Team Sports, Inc., Dixie Sporting Goods Co. Inc., Collegiate Pacific, Inc., Sport Supply Group, Inc., Orlando Team Sports, Inc., Salkeld & Sons, Inc.,  and Tomark Sports, Inc.**  BSN SPORTS **LLC f/k/a BSN SPORTS, INC.** accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, **BSN SPORTS LLC f/k/a BSN SPORTS, INC.** has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  **BSN SPORTS LLC f/k/a BSN SPORTS, INC.**, therefore, has been injured in its businesses and/or properties as a result of the unlawful conduct alleged herein.

26.     Plaintiff **Kwik Trip, Inc.** is a Wisconsin corporation with its principal place of business in Wisconsin.  **Kwik Trip, Inc.** accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, **Kwik Trip, Inc.** has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  **Kwik Trip, Inc.**, therefore, has been injured in its businesses and/or properties as a result of the unlawful conduct alleged herein.

27.     Plaintiff **ADFP Management Inc.** is a Delaware S corporation with

its principal place of business in New Jersey.  **ADFP Management Inc. and all of its related entities** accepts both Visa and MasterCard debit and credit cards for payment.   Accordingly, **ADFP Management Inc.** has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  **ADFP Management Inc.**, therefore, has been injured in its businesses and/or properties as a result of the unlawful conduct alleged herein.

28.    Plaintiff **Citi Trends, Inc.** is a Delaware corporation with its principal place of business in Savannah, Georgia.  **Citi Trends, Inc.** accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, **Citi Trends, Inc.** has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  **Citi Trends, Inc.**, therefore, has been injured in its businesses and/or properties as a result of the unlawful conduct alleged herein.

29.    Plaintiff **Allsup's Convenience Stores, Inc.** is a New Mexico corporation with its principal place of business in Clovis, New Mexico.  **Allsup's Convenience Stores, Inc.** accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, **Allsup's Convenience Stores, Inc.** has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  **Allsup's Convenience Stores, Inc.**, therefore, has been injured in its businesses and/or properties as a result of the unlawful conduct

alleged herein.

30.     Plaintiff **RaceTrac Petroleum, Inc.** is a Georgia corporation with its principal place of business in Georgia.   **RaceTrac Petroleum, Inc.** accepts both Visa and MasterCard debit and credit cards for payment.   Accordingly, **RaceTrac Petroleum, Inc.** has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.   **RaceTrac Petroleum, Inc.**, therefore, has been injured in its businesses and/or properties as a result of the unlawful conduct alleged herein.

31.     Plaintiff **Quick Chek Corporation f/k/a Quick Chek Food Stores** is a New Jersey C corporation with its principal place of business in Whitehouse Station, New Jersey.   **Quick Chek Corporation f/k/a Quick Chek Food Stores** accepts both Visa and MasterCard debit and credit cards for payment. Accordingly, **Quick Chek Corporation f/k/a Quick Chek Food Stores** has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.   **Quick Chek Corporation f/k/a Quick Chek Food Stores**, therefore, has been injured in its businesses and/or properties as a result of the unlawful conduct alleged herein.

32.     Plaintiff **QuikTrip Corporation** is an Oklahoma corporation with its principal place of business in Tulsa, Oklahoma.   **QuikTrip Corporation** accepts both Visa and MasterCard debit and credit cards for payment.   Accordingly,

**QuikTrip Corporation** has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  **QuikTrip Corporation**, therefore, has been injured in its businesses and/or properties as a result of the unlawful conduct alleged herein.

33.   Plaintiff **QuikTrip West, Incorporated** is a Kansas corporation with its principal place of business in Wichita, Kansas.  **QuikTrip West, Incorporated.** accepts both Visa and MasterCard debit and credit cards for payment. Accordingly, **QuikTrip West, Incorporated** has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  **QuikTrip West, Incorporated**, therefore, has been injured in its businesses and/or properties as a result of the unlawful conduct alleged herein.

34.   Plaintiff **Wawa, Inc.** is a New Jersey corporation with its principal place of business in Wawa, Pennsylvania.  **Wawa, Inc.** accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, **Wawa, Inc.** has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  **Wawa, Inc.**, therefore, has been injured in its businesses and/or properties as a result of the unlawful conduct alleged herein.

35.   Plaintiff **Waffle House, Inc. as Assignee on Behalf of Waffle House Franchises** is a Georgia corporation with its principal place of business in Georgia. The following Franchises have assigned their claim to **Waffle House, Inc.**:

**Angelle Enterprises, Inc., Chesapeake Waffles, Ahrooo Waffles, LLC, Amarillo Waffles, LLC, Buckeye Waffles, Inc., Cathia Inc., Choo Choo Waffles, LLC, Derby City Waffles, LLC, D. Love's Restaurants, LLC, Bluegrass Waffle, LLC, Hillcrest Foods, Inc., Hilltop Foods, LLC, Lehigh Valley Waffles, Inc., Just Us Waffles, LLC, JD's Wild West Waffles, Inc., J. Thomas & Co. Inc., JKW Enterprises, Inc., Lexidan Foods, LLC, Longhorn Waffles, Inc., Look Out Waffles, LLC, Lewis Jones Enterprises, Inc., M&M Waffles, LLC, Lakeland Foods, Inc., Mericle's, Inc., Miller Properties, Inc., Riverside Restaurant Group, LLC, Rocky Top Waffles, LLC, Memphis Food Group/River Waffles, Texas Waffle Co., Ltd., TW Odom Management Services, West Penn Waffles, LLC, Yellow Brick Foods, Inc., Winning Waffles, LLC and Yogi Hill Corp..  Waffle House, Inc. as Assignee on Behalf of Waffle House Franchises** accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, **Waffle House, Inc. as Assignee on Behalf of Waffle House Franchises** has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  **Waffle House, Inc. as Assignee on Behalf of Waffle House Franchises**, therefore, has been injured in its business and/or property as a result of the unlawful conduct alleged herein.

## <u>DEFENDANTS</u>

36.     Until the corporate restructuring and initial public offering described below, Defendant Visa International Service Association was a non-stock Delaware corporation with its principal place of business in Foster City, California. Defendant Visa U.S.A. Inc. was a group-member of Visa International Service Association and was also a non-stock Delaware corporation.  Visa U.S.A. Inc. had its principal place of business in San Francisco, California.  Visa U.S.A. Inc.'s members were the financial institutions acting as issuing banks and acquiring banks in the Visa system.

37.     Defendants Visa Inc., Visa International Service Association, and Visa U.S.A. Inc. are Delaware corporations with their principal place of business In Foster City, California.  Defendant Visa Inc. was created through a corporate reorganization in or around October 2007.  Visa U.S.A. Inc.'s member banks were the initial shareholders of Visa Inc.

38.     Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association are referred to collectively as "Visa" in this Complaint.

39.     Defendant MasterCard Incorporated was incorporated as a Delaware stock corporation in May 2001.  Its principal place of business is in Purchase, New York.

40.     Defendant MasterCard International Incorporated was formed in November 1966 as a Delaware membership corporation whose principal or affiliate members were its financial institution issuing banks and acquiring banks. Prior to the initial public offering described below, MasterCard International Incorporated was the principal operating subsidiary of MasterCard Incorporated. Defendant MasterCard International Incorporated is still a wholly owned subsidiary of MasterCard Incorporated and it also has its principal place of business in Purchase, New York.

41.     Defendants MasterCard International Incorporated and MasterCard Incorporated are referred to collectively as "MasterCard" in this Complaint.

## ALLEGATIONS

## THE PAYMENT CARD INDUSTRY IN GENERAL

42.     The payment card industry involves two categories of general purpose payment cards: (1) credit (including charge) cards and (2) debit cards.   As explained more fully below, credit cards constitute a separate product market from debit cards.

43.     Card issuers earn income when card users select and use their cards and when merchants accept their cards.  Issuing banks compete to have cardholders carry and use payment cards that they issue.  By agreeing to the Competitive

Restraints, issuing banks have agreed not to compete among themselves for merchant acceptance of payment cards.

44.    Credit cards (other than charge cards) permit consumers to borrow the money for a purchase from the card issuer and to repay that debt over time, according to the provisions of a revolving-credit agreement between the cardholder and the issuing bank.  Charge cards provide an interest-free loan during a grace period.

45.    Issuing banks compete for cardholders and card usage by offering numerous credit card products, some of which offer features such as cash back rebates, low interest rates, low or no annual fees, and rewards programs tied to usage.  Cards that offer cash-back, points, or other usage benefits are often referred to as "rewards cards."  Those rewards cards that offer the highest levels of rewards are referred to as "premium cards" and include cards such as Visa Signature Preferred and MasterCard World Elite.  Standard or "traditional" credit cards, which do not offer the same array of features to cardholders, include products such as Visa Traditional and the MasterCard Core Value card.  Interchange fees for premium credit cards are higher than the interchange fees merchants are charged on other rewards cards, which in turn are higher than those charged on standard credit card transactions.  Nevertheless, merchants do not have the ability to refuse to accept rewards cards.

46.     Debit cards are one means for demand deposit account holders to access the money in their accounts.   Pre-paid debit cards allow cardholders to access the funds deposited on the card when it was purchased.   There are two primary forms of authentication in use for debit cards in the United States.   One is signature-based, in which the cardholder's signature is usually (but not always) obtained at the time of the transaction.   The other is PIN-based, in which the cardholder enters a four-digit PIN to authenticate the cardholder.

47.     Because debit card transactions promptly withdraw funds from the cardholder's account or from the card balance, rather than allowing a grace period before billing and payment, they differ from credit card transactions in their utility to consumers.   These differences underlay the court's determination in *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), that credit card transactions comprised a separate market from the market for debit card transactions.

## COMBINATIONS AND CONSPIRACIES

48.     Visa and MasterCard until recently were organized as joint ventures of their member issuing banks and acquiring banks.   As members of the joint ventures, the member banks agreed to a collection of restrictive rules, referred to herein as the Competitive Restraints, and agreed to impose those Competitive Restraints on merchants that accept Visa-branded and MasterCard-branded cards.

Among the Competitive Restraints are "default" interchange fees that merchants are required to pay for the privilege of accepting Visa-branded and MasterCard-branded cards.  "Default" interchange fee rates are set by Visa and MasterCard for the benefit of their member issuing banks.  As a result of the Competitive Restraints, the "default" interchange fees are made binding.

49.    Through these joint ventures, Visa, MasterCard, and their respective issuing banks have collectively gained market power in the payment card market. The Competitive Restraints have eliminated competition among issuing banks for merchant acceptance and eliminated any possibility that competition between the issuing banks could enable separate terms of acceptance for the cards of each issuing bank.  These Competitive Restraints have eliminated the development of competitive markets for merchant acceptance.

50.    The Competitive Restraints enforced by Visa and MasterCard, and the actions taken in furtherance of these restraints, constitute combinations and conspiracies in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

51.    In 2006 and 2008, respectively, MasterCard and Visa each changed their ownership structures through initial public offerings ("IPOs") wherein the member banks partially divested their ownership of Visa and MasterCard.  But the IPOs did not change the essential character of their combinations and conspiracies

or the Competitive Restraints.  The motivation for these IPOs was to limit the appearance that Visa and MasterCard were controlled by their member banks. According to the prospectus for MasterCard's 2006 IPO, "heightened regulatory scrutiny and legal challenges" underlay the decision to make changes in the ownership structure of MasterCard.  In particular, MasterCard stated that "many of the legal and regulatory challenges we face are in part directed at our current ownership and governance structure in which our customers—or member financial institutions—own all of our common stock and are involved in our governance by having representatives serve on our global and regional boards of directors."

52.    After the IPOs, neither Visa, MasterCard, nor any of the member banks took any affirmative action to withdraw from the respective combinations and conspiracies.  To the contrary, even after the IPOs, the member banks of Visa and MasterCard continued to agree to and to enforce and adhere to the Competitive Restraints that eliminate competition among issuing banks for merchant acceptance.  Visa and MasterCard have continued to set "default" interchange fees for the benefit of their issuing bank members.  Thus, even after the IPOs, Visa's and MasterCard's members maintained and enforced the Competitive Restraints ensuring that they would not compete for merchant acceptance.

53.    After the IPOs, as before, Visa and MasterCard serve as facilitators and coordinators of horizontal agreements among their member banks to continue

to adhere to and enforce "default" interchange fees and the Competitive Restraints. It would be contrary to the independent self-interest of any single issuing bank to adhere to the Competitive Restraints without the agreement of the remaining issuing banks also to impose and adhere to those restraints.  Visa and MasterCard, by acting as the managers of their respective combinations and conspiracies and coordinating agreements to continue imposing and adhering to the Competitive Restraints, eliminate competition for merchant acceptance among their respective issuing banks.  But for the arrangements facilitated by Visa and MasterCard, the member banks would pursue their own independent self-interest by competing for merchant acceptance of the cards they issue.

54.    Each issuing bank is an independently owned and independently managed business.  Each issuing bank is a separate economic actor pursuing separate economic interests.  In other aspects of their businesses, the member banks compete against one another.  For example, the banks compete with one another for cardholders by creating payment card products that offer an array of interest rates, annual fees, purchase rewards, and other features that will make their payment cards more attractive than those offered by other issuing banks.  As found in *United States v. Visa U.S.A., Inc.*, cardholders "can choose from thousands of different card products with varying terms and features, including a wide variety of rewards and co-branding programs and services such as automobile insurance,

travel and reservation services, emergency medical services and purchase security/extended protection programs."   163 F. Supp. 2d at 334.   These facts continue to be true today.

55.    However, the member banks do not compete for merchant acceptance of the cards they issue.  Instead, both before and after the Visa and MasterCard IPOs, the member banks have ceded to Visa and MasterCard decision-making and action with respect to the terms upon which they will allow merchants to accept the cards they issue.  By continuing to agree to and adhere to the Competitive Restraints and default interchange fees, the member banks have deprived the marketplace of independent centers of decision-making and, therefore, of actual or potential competition.

## THE RELEVANT PRODUCT MARKETS

56.    The relevant product markets are the market for merchant acceptance of general purpose credit (including charge) cards and the market for merchant acceptance of debit cards.   Credit cards and debit cards are not reasonably interchangeable with each other or with other forms of tender.

57.    Banks issuing credit and debit cards compete with one another to issue their cards to consumers (cardholders) who use those cards to purchase goods and services from merchants.   This competition occurs in the markets for the issuance of credit and debit cards.   Absent the Competitive Restraints, banks

issuing such cards would seek access to merchants that are willing to accept their cards as payment for the goods and services the merchants sell to consumers.  As a result, absent the Competitive Restraints at issue in this case, issuing banks would compete over the terms of acceptance of their cards by merchants.

58.     Merchant acceptance of general purpose credit cards is a relevant product market.  A credit card is not interchangeable with a debit card or other form of tender. Many cardholders desire the ability to access a line of credit, defer payment, or other features offered by the credit cards.  For this reason, Plaintiffs and other merchants cannot discontinue acceptance of credit cards, even in the face of high or increasing interchange fees, without losing sales.  Visa and MasterCard and their Member Banks are not constrained in the charges they impose for merchant acceptance of credit cards by the availability of debit cards and other forms of tender as payment options.

59.     Merchant acceptance of debit cards is also a relevant product market. Debit cards are not reasonably interchangeable with credit cards and other forms of tender. Debit cards differ from credit cards in significant ways.  Debit cards must be tied to a bank account or pre-paid, unlike credit cards.  When a debit card is used, the funds are withdrawn from the cardholder's account either the same day or within a few days.   Consumers who desire to pay for a transaction with immediately available funds may not want to carry large amounts of cash or checks

on their person, and not all merchants accept checks.   Consumers who cannot qualify for credit cards or have reached the credit limit on their credit cards may also prefer the use of debit cards to other options.   Thus, merchants cannot discontinue acceptance of debit cards.

60.   Debit cards are also regulated separately and differently from credit cards.   As discussed above, in 2011 the Federal Reserve Board imposed a maximum level for debit card interchange fees charged by large banks pursuant to the Durbin Amendment.   The legislation did not mandate that Federal Reserve Board regulate interchange fees charged in connection with credit card transactions.

61.   Visa, MasterCard, and their Member Banks are not constrained in the charges they impose on merchants for debit card acceptance by the availability of credit cards or other forms of tender as a payment option.

## RELEVANT GEOGRAPHIC MARKET

62.   The relevant geographic market is the United States and its territories.

63.   The default interchange fees are set by Visa and MasterCard, respectively, on a national basis.  Similarly, the Competitive Restraints are specific to the United States and its territories.

64.   Plaintiffs operate throughout the United States.   The Competitive Restraints imposed on them require that they accept all cards of all issuing banks

who are members of Visa or of MasterCard at "default" interchange fees at all of their outlets throughout the United States.

65.    Visa and MasterCard, and their largest issuing banks, advertise nationally and pursue promotional strategies aimed at the United States as a whole.

## THE COMPETITIVE RESTRAINTS

66.    On behalf of the issuing banks that are their members, Visa and MasterCard have adopted and imposed supra-competitive "default" interchange fees and other Competitive Restraints on Plaintiffs that eliminate competition. These Competitive Restraints prevent competition among the issuing banks for transaction volume from merchants.  As a result, the Competitive Restraints cause Plaintiffs' costs of acceptance to be higher than would prevail in a competitive market.

67.    Collective Setting of Interchange:  Visa and MasterCard set so-called "default" interchange fees on credit card and debit card transactions that merchants are required to pay to their issuing banks.  The setting of "default" interchange fees and other Competitive Restraints constitute the fixing of prices within the meaning of the Sherman Act.

68.    Visa and MasterCard each have established complex "default" interchange fee schedules.  In setting the interchange fees that are paid to their member banks, Visa and MasterCard each acts as the manager of its respective

combination, setting the price that merchants pay for card acceptance.  Interchange

fees account for the largest portion of merchant costs for accepting such cards.

69.     Interchange fees are not set to recover Visa's or MasterCard's costs of

providing network services.   Interchange is a fee that Visa and MasterCard,

respectively, acting in combination with the issuing banks, require merchants to

pay to the issuing banks.

70.     Visa purports to set non-binding "default" interchange fees.  Visa

Core Principle No. 10.3 provides that "[i]nterchange reimbursement fees are

determined by Visa ... or may be customized where members have set their own

financial terms for the interchange of a Visa transaction or Visa has entered into

business agreements to promote acceptance and card usage."

71.     MasterCard also purports to set non-binding "default" interchange

fees. MasterCard Rule 9.4 provides: "[a] transaction or cash disbursement cleared

and settled between Customers gives rise to the payment of the appropriate

interchange fee or service fee, as applicable.  The Corporation has the right to

establish default interchange fees and default service fees (hereafter referred to as

'interchange fees' and 'service fees,' or collectively, 'fees'), it being understood that

all such fees set by the Corporation apply only if there is no applicable bilateral

interchange fee or service fee agreement between two Customers in place. . . .

Unless an applicable bilateral interchange fee or service fee agreement between

two Customers is in place, any intraregional or interregional fees established by the Corporation are binding on all Customers."

72.    Acquiring banks that do not deduct the applicable interchange fee when submitting a transaction for authorization, clearance, and settlement are subject to fines assessed by Visa and MasterCard.  Both Visa's and MasterCard's rules, quoted above, fix interchange, because the other Competitive Restraints remove any independent competition among issuing banks in the setting of interchange fees.

73.    Absent the Competitive Restraints, Plaintiffs would pay interchange fees for acceptance, if at all, as determined by competition among issuing banks for merchant acceptance.    In the markets created by the Visa and MasterCard combinations, Visa and MasterCard, acting for their member banks, establish interchange fee schedules for their member banks.    Plaintiffs are among the merchants injured by this collective setting of interchange fees by Visa and MasterCard.

74.    Honor All Cards Rules:  These rules require in relevant part that a merchant that accepts any Visa-branded or MasterCard-branded credit card must accept all Visa-branded or MasterCard-branded credit cards, no matter which bank issued the card or the card type.  Similarly, a merchant that accepts Visa-branded or MasterCard-branded debit cards must accept all Visa-branded or MasterCard-

branded debit cards, no matter the issuing bank.  Because of the Honor All Cards Rules, Plaintiffs cannot reject any or all of the types of cards issued by any particular issuing bank.  Thus, Plaintiffs are precluded from gaining the benefits of competition as to the terms upon which they will accept or reject the cards of any issuing bank that is a member of Visa or MasterCard.  As a result, the "default" interchange fees become binding on Plaintiffs.

75.   All Outlets Rules:  The All Outlets Rules require merchants who accept Visa-branded or MasterCard-branded payment cards to accept those cards at all of their merchant locations, even if the location is operating under a different trade name or banner.  A merchant is not permitted to accept the cards at some banners or trade names but not others.  These rules preclude merchants from gaining the benefits of competition as to the terms of acceptance (for example, by accepting certain cards at certain trade names or banners, but not others).

76.   No Discount Rules:  Under the No Discount Rules, merchants were only allowed to offer discounts to customers who paid in cash, rather than using a payment card.  A merchant's inability to offer various discounts impedes the benefits of competition as to the terms of acceptance with an issuing bank.

77.   No Surcharge Rules:  The No Surcharge Rules prohibit Plaintiffs from surcharging transactions in which a consumer used a Visa-branded card or a MasterCard-branded card.  These rules eliminate a merchant's ability to utilize

surcharging as a tool in gaining the benefits of competition as to the terms of acceptance with an issuing bank. Absent the rules, a merchant could surcharge a transaction in which the consumer uses a card that, for example, demands a higher interchange fee.

78. The Competitive Restraints, individually and in combination, eliminate issuing bank competition for merchant acceptance. In the absence of these rules, the market for merchant acceptance would be competitive. Plaintiffs and the issuing banks would be able to gain the benefits of competition as to the terms under which Plaintiffs would accept an issuing bank's cards, including the amount of interchange fees--if any--Plaintiffs would pay on transactions involving an issuing bank's cards. Competition among issuing banks for merchant acceptance would result in lower interchange fees for Plaintiffs and allow them to enhance the value their customers receive.

79. The Honor All Cards Rules, the No Discount Rules, the No Surcharges Rules, and the All Outlets Rules, individually and in combination, eliminate the incentives for Visa and MasterCard to compete for merchant acceptance through setting lower "default" interchange fees.

80. In addition to the Competitive Restraints, a variety of other rules and regulations (often not publicly disclosed) enforced by Visa and MasterCard and

their member banks also operate to support the anticompetitive effects of the Competitive Restraints and imposition of "default" interchange fees on Plaintiffs.

81.    The Competitive Restraints, including the collective setting of "default" interchange fees, are not reasonably necessary to accomplish any legitimate efficiency-generating objectives of the Visa and MasterCard combinations.   Furthermore, there exist numerous alternative means that are less harmful to competition by which any such objectives could be accomplished.

## **MARKET POWER**

82.    Visa and its issuing banks jointly have market power in the relevant market for merchant acceptance of general purpose credit cards in the United States and its territories.

83.    In 2001, in *United States v. Visa US.A., Inc.*, 163 F. Supp. 2d 322,341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), the court found that Visa had market power in the market for credit card network services with a 47% share of the dollar volume of credit card transactions in the United States.   In 2003, in *In re Visa Check/MasterMoney Antitrust Litigation*, 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003), the court reaffirmed that Visa had market power in the credit card market based on a finding that its market share fluctuated between 43%

and 47%, as well as the barriers to entering the relevant product market.  Visa's share of the credit card market has not changed significantly since these two holdings.  The prior judicial findings of market power demonstrate that Visa has market power in the general purpose credit card market.

84.   There are significant barriers to entry into the market for general purpose credit cards.  Indeed, the court in *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), specifically found that there are high barriers to entry into the general purpose credit card market.  Visa's former CEO described starting a new card network as a "monumental" task involving expenditures and investment of over $1 billion.  Both AT&T and Citibank conducted entry analyses, but decided it would be unprofitable to attempt to start a competing general purpose credit card business.

85.   The difficulties associated with entering the network market are exemplified by the fact that no company has entered since Discover did so in 1985.  Discover has never achieved more than a 7% share of the general purpose credit card market and its current share is approximately 5%.

86.   Visa's conduct is direct evidence of its market power and that of its issuing banks.  Visa promulgates and enforces the Competitive Restraints, which prevent competition among its issuing banks for merchant acceptance.  Absent the Competitive Restraints, Visa's credit card issuing banks would gain the benefits of

competition as to the terms of merchant acceptance, including interchange fees, and Plaintiffs would benefit through lower interchange fees and other benefits from competition.

87.  Visa's "default" credit interchange fees demonstrate Visa's market power. Effective credit card interchange fees have risen over time, even as the costs of issuing credit cards have fallen for its member banks and even as interchange fees for debit cards have fallen.  Despite these increases, merchants have not stopped accepting Visa credit cards.  Further, Visa's market power is demonstrated by its ability to discriminate in price among types of merchants, by distinguishing merchants by size, transactions by size, cards by type, and merchants by retail category.

88.  Visa's market power in credit cards is also demonstrated by the fact that when the Federal Reserve Board significantly reduced the interchange fees on debit transactions, few if any merchants chose to stop accepting Visa credit cards, and Visa did not reduce its credit card interchange fees.  In 2012, the first full year after implementation of reduced interchange fees on debit transactions, Visa credit card transactions and purchase volume increased.

89.  Competition with MasterCard does not eliminate Visa's exercise of market power in the market for merchant acceptance of general purpose credit cards.  During the period that Visa and MasterCard were both joint ventures

consisting of their member banks, they adopted parallel rules that limited competition for merchant acceptance.   After their respective IPOs, Visa's and MasterCard's membership, rules, and their power to obtain high interchange fees from merchants have not changed and continue to constrain competition between Visa and MasterCard and among the members of both combinations.

90.   MasterCard and its issuing banks jointly have market power in the relevant market for merchant acceptance of general purpose credit cards in the United States.

91.   In *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), the court held that MasterCard's 26% share of dollar volume of credit and charge card transactions was sufficient to demonstrate that it had market power in the market for credit card network services. In *In re Visa Check/MasterMoney Antitrust Litigation*, 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003), the court held that MasterCard's 26% to 28% share of the credit card market was sufficiently high to go to a jury on the question of MasterCard's market power.   MasterCard's share of the credit card market has not changed significantly since those decisions.

92.   MasterCard's conduct is direct evidence of its market power and that of its issuing banks.   Interchange fees are set by MasterCard on behalf of its issuing banks. MasterCard also promulgates and enforces the Competitive

Restraints, which prevent competition among its issuing banks for merchant acceptance.  Absent the Competitive Restraints, MasterCard's credit card issuing banks would gain the benefits of competition as to the terms of merchant acceptance, including interchange fees, and Plaintiffs would benefit through lower interchange fees and other benefits from competition.

93.    MasterCard's  "default"  credit  interchange  fees  demonstrate MasterCard's market power.  Effective credit card interchange fees have risen over time, even as the costs of issuing credit cards have fallen for its member banks and even as interchange fees for debit cards have fallen.  Despite these increases, merchants have not stopped accepting MasterCard credit cards.  Further, MasterCard's market power is demonstrated by its ability to discriminate in price among types of merchants, by distinguishing merchants by size, transactions by size, cards by type, and merchants by retail category.

94.    Competition with Visa does not eliminate MasterCard's exercise of market power in the market for merchant acceptance of general purpose credit cards either.  During the period that Visa and MasterCard were joint ventures consisting of their member banks, they adopted rules that limited competition for merchant acceptance.   After their respective IPOs, Visa's and MasterCard's membership, rules, and (most importantly) power to obtain high interchange fees

from merchants did not change and continue to constrain competition between Visa and MasterCard and among the members of both combinations.

95.     As alleged above, there are significant barriers to entry into the market for the provision of general purpose payment card network services to merchants.

96.     The debit card market is dominated by Visa and MasterCard. Combined, Visa and MasterCard comprised about 75% of all debit purchase volume in 2004 and comprise over 80% today.   Only Visa, MasterCard, and Discover allow signature authorization of debit transactions.

97.     Visa, jointly with its issuing banks, and MasterCard, jointly with its issuing banks, each exercise market power in the market for merchant acceptance of debit cards.

98.     Visa and its issuing banks jointly have market power in the market for acceptance of debit cards.   Visa participates in and manages a combination comprised of the vast majority of issuing banks of debit cards, such that merchants are unable to refuse to accept Visa-branded debit cards.   This combination of issuing banks combined with the Competitive Restraints gives Visa market power. Visa has exercised and continues to exercise market power by requiring Plaintiffs to pay supra-competitive interchange fees and by imposing the Competitive Restraints.

99.    Visa's market power over merchants is demonstrated by the fact that, when the tie forcing merchants to accept Visa debit cards as a condition of accepting Visa credit cards was dropped in 2003, there is no evidence that merchants were able to stop accepting Visa debit cards despite the availability of lower cost PIN debit networks.  In addition, in 2011 the Federal Reserve Board found that Visa's debit interchange rates were significantly above cost.  Because of Visa's Competitive Restraints, merchants cannot gain the benefits of competition among issuing banks for terms of debit card acceptance.

100.    MasterCard and its issuing banks jointly have market power in the market for acceptance of debit cards.  MasterCard participates in and manages a combination comprised of a significant fraction of all issuers of debit cards, such that merchants are unable to refuse to accept MasterCard-branded debit cards. This combination of issuing banks combined with the Competitive Restraints gives MasterCard market power. MasterCard has exercised and continues to exercise market power by requiring Plaintiffs to pay supra-competitive interchange fees and by imposing the Competitive Restraints.

101.    MasterCard's market power over merchants is demonstrated by the fact that, when the tie forcing merchants to accept MasterCard debit cards as a condition of accepting MasterCard credit cards was dropped in 2003, few or no merchants stopped accepting MasterCard debit cards despite the availability of

lower cost PIN debit networks.  In addition, in 2011 the Federal Reserve Board found that MasterCard's debit interchange rates were significantly above cost. Because of MasterCard's Competitive Restraints, merchants cannot gain the benefits of competition among issuing banks for terms of debit card acceptance.

## COMPETITIVE INJURY

102.  Visa and MasterCard use their market power to impose "default" interchange fees and the Competitive Restraints on Plaintiffs.

103.  The Competitive Restraints make it impossible for the Plaintiffs to gain the benefits of competition as to the terms of acceptance, including lower interchange fees with individual issuing banks.  The Competitive Restraints provide a mechanism for issuing banks to avoid competing for acceptance.  Absent the supra-competitive "default" interchange fees and the other Competitive Restraints, Plaintiffs would be able to gain the benefits of competition as to interchange fees, which would reduce them to a competitive level.  The changes to the Competitive Restraints that were instituted as a result of prior settlements and enforcement actions have not eliminated the market power of the combinations and have not curtailed the level or rise in effective interchange fees being paid by merchants.

104.  Each Plaintiff has been harmed by the actions of the Visa and MasterCard combinations.  The amount of interchange fees paid by each Plaintiff

is supra-competitive.   The high interchange fees levied on Plaintiffs lead to increased merchandise prices for consumers or otherwise diminish the value their customers receive.   Thus, consumers, as well as merchants such as Plaintiffs, are harmed by the combinations' anticompetitive conduct, including the imposition of "default" interchange fees.

105.   But for the Competitive Restraints, competition among issuing banks for merchant acceptance would result in lower interchange fees.   Each Plaintiff would have the opportunity to use the strategies it uses in other parts of its business or operations to obtain competitive acceptance terms.   As a result of the Competitive Restraints, card acceptance is a significant cost to Plaintiffs and they have no ability to gain lower costs in a competitive market.

106.   From 2004 to the present Plaintiffs have accepted Visa-branded and MasterCard-branded credit and debit cards.   Accordingly, Plaintiffs have been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supra-competitive interchange fees, all to its detriment.

## CLAIMS FOR RELIEF

### Count 1:  Violation of Section 1 of the Sherman Act, Collectively and Separately, by Visa's Competitive Restraints Governing Credit Cards

107.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 185 as if fully rewritten herein.

108. The use of credit cards issued by members of Visa and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

109. Visa and its member banks are a combination and conspiracy within the meaning of Section 1 of the Sherman Act. Visa's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act. Visa's Competitive Restraints, as defined above, constitute horizontal agreements among Visa and its members both prior to and after Visa's reorganization and IPO. Visa has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing credit cards agreed to by Visa members. Accordingly, by these arrangements, Visa has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the credit cards each issue. It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by Visa, similarly not to compete.

110. In addition, Visa's rules and related contracts entered into before the Visa IPO constituted a horizontal agreement from which Visa and the member banks have never withdrawn. In changing its corporate form at the time of the

IPO, Visa did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements.  Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

111.   Alternatively, after the Visa IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

112.   As alleged above, Visa and its members jointly have market power in the market for merchant acceptance of general purpose credit cards.

113.   Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Visa-branded credit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of Visa-branded credit cards, in violation of Section 1 of the Sherman Act.

114.  Visa's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.  Under the Honor All Cards Rules, Visa affords merchants no choice but to accept Visa-branded cards from its issuing banks on an all-or-nothing basis.  Each issuing bank's cards, however, are separate

products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards.  The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks.  By unlawfully forcing merchants to accept the Visa-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the price of acceptance paid by merchants.  But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.

115.  Visa's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to the fees paid to particular issuing banks.  This further eliminates merchant acceptance as one of the areas of competition among issuing banks.  Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain banners or trade names, to offering benefits to consumers tendering certain card types of certain issuing banks.  But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for credit cards.

116.   Visa's setting of "default" interchange fees for the acceptance of Visa-branded credit cards further prevents the cost of acceptance from being determined between each Plaintiff and the various individual issuing banks in a competitive market.   Instead, Visa's supra-competitive interchange fees are set collectively by Visa in conjunction with or on behalf of all of its member issuing banks.   Absent the setting of "default interchange" fees for Visa-branded credit cards by Visa and the other Competitive Restraints managed by Visa, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuer.

117.   As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of credit cards by merchants, which are the result of Visa's Competitive Restraints.   The effect of these restraints has been to increase the cost of acceptance of credit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers through higher costs and decreased consumer welfare.

### Count 2:  Violation of Section 1 of the Sherman Act, Collectively and Separately, by Visa's Competitive Restraints Governing Debit Cards

118.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 185 as if fully rewritten herein.

119.   The use of debit cards issued by members of Visa and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

120.   Visa and its member banks are a combination and conspiracy within the meaning of Section 1 of the Sherman Act.  Visa's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act.  Visa's Competitive Restraints, as defined above, constitute horizontal agreements among Visa and its members both prior to and after Visa's reorganization and IPO.  Visa has served and continues to serve as the manager of a combination that limits competition between the bank members of the combination through the rules governing debit cards agreed to by Visa members.   Accordingly, by these arrangements, Visa has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the debit cards each issues.  It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by Visa, similarly not to compete.

121.   In addition, Visa's rules and related contracts entered into before the Visa IPO constituted a horizontal agreement from which Visa and the member banks have never withdrawn.  In changing its corporate form at the time of the IPO, Visa did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to

effectuate withdrawal from the rules and agreements.  Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rule and agreements.

122.  Alternatively, after the Visa IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

123.  As alleged above, Visa and its members jointly have market power in the market for merchant acceptance of debit cards.

124.  Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Visa-branded debit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of debit cards, in violation of Section 1 of the Sherman Act.

125.  Visa's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.  Under the Honor All Cards Rules, Visa affords merchants no choice but to accept cards from its issuing banks on an all-or-nothing basis.  Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards.  The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks.  By unlawfully forcing merchants to accept the

Visa-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the price of acceptance paid by merchants.  But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.

126.  Visa's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to fees paid to particular issuing banks.  Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks.  But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for debit cards.

127.  Visa's setting of "default" interchange fees for the acceptance of Visa-branded debit cards further prevents the cost of acceptance from being determined between each Plaintiff and the various individual issuing banks in a competitive market.  Instead, Visa's supra-competitive interchange fees have been set collectively by Visa in conjunction with or on behalf of all of its member issuing banks.  Absent the setting of "default" interchange fees for Visa-branded debit

cards by Visa and the other Competitive Restraints managed by Visa, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuing bank.

128.   The maximum debit interchange fees enacted by the Federal Reserve as a result of the Durbin Amendment have not eliminated the anticompetitive effects of Visa's setting of "default" interchange fees.  Regardless of the ultimate outcome of Judge Richard Leon's July 31, 2013 Order discussed above, the damages suffered by Plaintiffs because of the imposition of supra-competitive debit interchange fees may be reduced by regulation pursuant to the Durbin Amendment, but such interchange fees being levied on Plaintiffs by the combination will almost certainly still be higher than they would be if there were active competition for merchant acceptance.  Accordingly, Plaintiffs will continue to suffer damage by being forced to pay supra-competitive interchange fees on Visa debit card transactions.

129.   As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of debit cards by merchants, which are the result of Visa's Competitive Restraints.  The effect of these restraints has been to increase the cost of acceptance of debit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers through higher costs and increased prices.

### Count 3:  Violation of Section 1 of the Sherman Act, Collectively and Separately, by MasterCard's Competitive Restraints Governing Credit Cards

130.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 185 as if fully rewritten herein.

131.   The use of credit cards issued by members of MasterCard and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

132.   MasterCard and its member banks are a combination and conspiracy within the meaning of Section 1 of the Sherman Act.  MasterCard's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act.  MasterCard's Competitive Restraints, as defined above, constitute horizontal agreements among MasterCard and its members both prior to and after MasterCard's IPO.  MasterCard has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing credit cards agreed to by MasterCard members.  Accordingly, by these arrangements, MasterCard has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the credit cards each issues.  It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an

agreement with other issuing banks, managed by MasterCard, similarly not to compete.

133.   In addition, MasterCard's rules and related contracts entered into before the MasterCard IPO constituted a horizontal agreement from which MasterCard and the member banks have never withdrawn.   In changing its ownership structure at the time of the IPO, MasterCard did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements.   Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

134.   Alternatively, after the MasterCard IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

135.   As alleged above, MasterCard and its members jointly have market power in the market for merchant acceptance of general purpose credit cards.

136.   Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of MasterCard-branded credit cards and to prevent the operation of and interfere with the competitive process

with respect to the acceptance of credit cards, in violation of Section 1 of the Sherman Act.

137.   MasterCard's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.   Under the Honor All Cards Rules, MasterCard affords merchants no choice but to accept cards from its issuing banks on an all-or-nothing basis.   Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards.   The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks.   By unlawfully forcing merchants to accept the MasterCard-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the cost of acceptance paid by merchants.   But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.

138.   MasterCard's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to the fees paid to particular issuing banks.   Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing

banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks.  But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for credit cards.

139.   MasterCard's setting of "default" interchange fees for the acceptance of MasterCard-branded credit cards further prevents the cost of acceptance from being determined between each Plaintiff and the various individual issuing banks in a competitive market.  Instead, MasterCard's supra-competitive interchange fees are set collectively by MasterCard in conjunction with or on behalf of all of its member issuing banks.  Absent the setting of "default" interchange fees for MasterCard-branded credit cards by MasterCard and the other Competitive Restraints managed by MasterCard, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuing bank.

140.   As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of credit cards by merchants, which are the result of MasterCard's Competitive Restraints.  The effect of these restraints has been to increase the cost of acceptance of credit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers through higher costs and increased prices.

**Count 4:  Violation of Section 1 of the Sherman Act, Collectively and Separately, by MasterCard's  Competitive Restraints Governing Debit Cards**

141.   Plaintiffs  incorporate  by  reference  the  allegations  contained  in paragraphs 1 through 185 as if fully rewritten herein.

142.   The use of debit cards issued by members of MasterCard and the rules governing  the  use  of  such  cards  occur  in  and  have  a  substantial  anticompetitive effect on interstate commerce.

143.   MasterCard and its member banks are a combination and conspiracy within  the  meaning  of  Section  1  of  the  Sherman  Act.   MasterCard's  rules  and related  contracts  constitute  agreements  within  the  meaning  of  Section  1  of  the Sherman  Act.   MasterCard's  Competitive  Restraints,  as  defined  above,  constitute horizontal  agreements  among  MasterCard  and  its  members  both  prior  to  and  after MasterCard's  IPO.   MasterCard  has  served  and  continues  to  serve  as  the  manager of a combination and conspiracy that limits competition among the bank members of  the  combination  through  the  rules  governing  debit  cards  agreed  to  by MasterCard  members.   Accordingly,  by  these  arrangements,  MasterCard  has facilitated and continues to facilitate a horizontal agreement among its members, which  would  otherwise  compete  for  merchant  acceptance  of  the  debit  cards  each issues.  It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an

agreement with other issuing banks, managed by MasterCard, to similarly not compete.

144.   In addition, MasterCard's rules and related contracts entered into before the MasterCard IPO constituted a horizontal agreement from which MasterCard and the member banks have never withdrawn.   In changing its ownership structure at the time of the IPO, MasterCard did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements.   Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

145.   Alternatively, after the MasterCard IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

146.   As alleged above, MasterCard and its members jointly have market power in the market for merchant acceptance of debit cards.

147.   Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix price of acceptance of MasterCard-branded debit cards and to prevent the operation of and interfere with the competitive process with

respect to the acceptance of debit cards, in violation of Section 1 of the Sherman Act.

148.   MasterCard's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.   Under the Honor All Cards Rules, MasterCard affords merchants no choice but to accept MasterCard-branded cards from its issuing banks on an all-or-nothing basis.   Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards.   The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks.   By unlawfully forcing merchants to accept the MasterCard-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the prices of acceptance paid by merchants.   But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.

149.   MasterCard's Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to fees paid to particular issuing banks.   Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing

banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks.   But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for debit cards.

150.   MasterCard's setting of default interchange fees for the acceptance of MasterCard-branded debit cards further prevents the cost of acceptance from being determined between each Plaintiff and the various individual issuing banks in a competitive market.   Instead, MasterCard's supra-competitive interchange fees are set collectively by MasterCard in conjunction with or on behalf of all of its member issuing banks.   Absent the setting of "default" interchange fees for MasterCard-branded debit cards by MasterCard and the other Competitive Restraints managed by MasterCard, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuing bank.

151.   The maximum debit interchange fees enacted by the Federal Reserve as a result of the Durbin Amendment have not eliminated the anticompetitive effects of MasterCard's setting of "default" interchange fees.   Regardless of the ultimate outcome of Judge Richard Leon's July 31, 2013 Order discussed above, the damages suffered by Plaintiffs because of the imposition of supra-competitive debit interchange fees may be reduced by regulation pursuant to the Durbin

Amendment, but such interchange fees being levied on Plaintiffs by the combination will almost certainly still be higher than they would be if there were active competition for merchant acceptance.  Accordingly, Plaintiffs will continue to suffer damage by being forced to pay supra-competitive interchange fees on MasterCard debit card transactions.

152.   As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of debit cards by merchants, which are the result of MasterCard's Competitive Restraints.  The effect of these restraints has been to increase the cost of acceptance of debit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers through higher costs and increased prices.

## DAMAGES

153.   Plaintiffs seek to recover from Defendants the following damages pursuant to 15 U.S.C. § 15(a) for the wrongful conduct outlined above:

- Actual damages for acts and omissions occurring prior to November 27, 2012;

- Treble damages on all actual damages found by the trier of fact;

- Attorneys' fees;

- Costs of suit; and

- Pre and post judgment interest at the maximum rate permitted by law.

Further, because their wrongful conduct was committed in combination and as part of a conspiracy, the Defendants should be jointly and severally liable for all damages found by the trier of fact.

## DEMAND FOR JURY TRIAL

154.   Pursuant to Fed.R.Civ.P. 38(b), Plaintiffs demand that, at the trial of this cause, a jury be empanelled to determine all disputed issues of fact.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.   Judgment in favor of each Plaintiff and against each Defendant, in an amount to be determined at trial including, but not limited to, compensatory damages, trebled damages, and pre-judgment and post-judgment interest, as permitted by law;

B.   An award of the cost of the suit, including a reasonable attorney's fee; and

C.   Such other and further relief as the Court deems just, equitable, and proper.

Respectfully submitted,

By:   _/s/ Richard E. Norman_
    Richard E. Norman
    Texas Bar No. 00788128
    rnorman@crowleynorman.com
    **CROWLEY NORMAN LLP**
    Three Riverway, Suite 1775
    Houston, Texas 77056
    Telephone: (713) 651-1771
    Facsimile: (713) 651-1775

    **LEAD COUNSEL FOR ALL PLAINTIFFS**

**OF COUNSEL:**

Jeffrey J. Angelovich
Texas Bar No. 00786988
jangelovich@npraustin.com
**NIX, PATTERSON & ROACH, LLP**
3600 N. Capital of Texas Hwy.
Building B, Suite 350
Austin, TX 78746
Telephone:   (512) 328-5333
Facsimile:  (512) 328-5335

William Curtis Webb
Texas Bar No. 21035900
cwebb@beckredden.com
Fields Alexander
Texas Bar No. 00783528
falexander@beckredden.com
**BECK REDDEN LLP**
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
Telephone:  (713) 951-3700
Facsimile:  (713) 951-3720